**FIRST INTERSTATE BANK OF TEXAS, N.A., et al., Appellants,**

v.

**S.B.F.I., INC., a Delaware Corporation, et al., Appellees.**

**No. 05–90–01138–CV.**

Court of Appeals of Texas, Dallas.

April 21, 1992.

---

there is no evidence or, alternatively, insufficient evidence to support appellees' negligence and negligent misrepresentation claims; (2) the trial court erred in submitting various jury instructions and in failing to submit its requested instructions; and (3) the evidence shows as a matter of law that the actions of a third party were a new and independent cause of appellees' damages and that appellees waived their rights against Bank. Dale urges three points of error, arguing that there is no evidence or, alternatively, insufficient evidence to support the jury's findings that he participated in a conspiracy. We reverse and render a take-nothing judgment on appellees' negligence and conspiracy claims. We reverse and remand appellees' negligent misrepresentation claim.

## FACTUAL BACKGROUND

Summa New Mexico engages primarily in research and development of cancer-detection drugs. S.B.F.I. serves as the investment arm for Summa New Mexico. In 1987, Lou Camilli, appellees' employee, met Bill Ballard, whose real name is Joel Bailey.[2] Ballard told Camilli about an investment plan whereby Summa New Mexico would sell bonds and use the bond proceeds to buy certificates of deposit that, in turn, would be sold to Ballard's "offshore interests," whom Ballard said would remain anonymous. No buyers for the bonds were found. Beginning in Spring 1988, Ballard proposed a new investment plan. Appellees would entrust $1 million to Ballard, who would engage in bond transactions to establish a "track record." As part of the arrangement, appellees executed a power of attorney in favor of Finance Institute, Inc., Ballard's company.

On June 2, 1988, an account in the name of Summa Medical Corporation was opened at First Republic Bank in Dallas, Texas. Withdrawals from the account could be made by Francisco Urrea, president of appellees; Trey Urrea, vice president of ap-

Charles A. Gall, Harden R. Ramey, Will S. Montgomery, Dallas, Tim Leonard, R.C. Muller, Houston, for appellants.

Stephen Cass Weiland, J. Thomas Scott, Jack Pew Jr., Dallas, for appellees.

Before STEWART, CHAPMAN and KAPLAN, JJ.

## OPINION

STEWART, Justice.

First Interstate Bank of Texas (Bank) and Claude Dale appeal from the trial court's judgment in favor of Summa Medical Corporation, a New Mexico Corporation (Summa New Mexico), and its subsidiary, S.B.F.I., Inc.[1] Appellees filed suit against Bank for negligence and negligent misrepresentation and against Dale for conspiracy. On appeal, Bank asserts forty points of error generally complaining that: (1)

---

1. S.B.F.I. and Summa New Mexico are referred to collectively as appellees.

2. We refer to Bailey/Ballard according to the name he used at the time of the events discussed.

pellees; Carolina Bailey, Bailey's wife; or Charlene Baggese. Carolina Bailey was the account representative, and account statements were mailed to her. The purpose of the account was to "purchase interest bearing instruments in the name of Summa Medical Corporation," although no arrangements were made to insure that this limitation would be enforced.

On June 14, 1988, Bailey, using his real name, established a Texas corporation named Summa Medical Corporation (Summa Texas). On June 15, 1988, using Summa Texas' corporate documents, Bailey opened an account at Bank in Houston, Texas, in the name of Summa Medical Corporation (the account). Bailey was the only person authorized to sign on the account. Bailey wired the funds in the First Republic Bank account to Summa Texas' account at Bank. During this trip to Houston, Bailey stayed at Dale's home, drove one of Dale's vehicles, and worked out of Dale's offices.

After the account was opened, Ralph Adams, a Bank loan officer, obtained a Dun & Bradstreet report to get information which would be helpful in attracting other business with respect to the account. The Dun & Bradstreet report was for Summa New Mexico. On June 20, 1988, Adams called Summa New Mexico, which he mistakenly believed to be the depositor. Among other things, Adams told Camilli that Summa's account was at Bank and that transactions had commenced. During the conversation, Camilli learned that Bailey was authorized on the account. Camilli told Adams that he did not know Bailey and that only Ballard was authorized to act for Summa New Mexico. To that, Adams responded, "Oh, yeah, him too." Camilli told Adams to place a hold on the account. Adams was "noncommittal."

Bailey was in Houston on June 20 to 25. He again stayed with Dale, drove Dale's vehicle, and worked out of Dale's offices. On June 24, 1988, Bailey wired $754,376 to Houston Numismatic Exchange for the purchase of gold coins. An invoice from the Exchange shows that Bailey received 1700 gold pieces on June 24, and 100 on June 27.

On June 28, 1988, Ballard called Camilli and told him that he had taken all of the money out of the account and had converted it into hard, untraceable assets so that he could continue to buy and to sell instruments and could continue to protect his investors. Camilli demanded a meeting immediately, and flew to Dallas that day with appellees' in-house counsel, Bob Strumor. At the meeting, Ballard told Camilli and Strumor that the investors would remain anonymous and that, to protect those people, he had formed Summa Texas, had withdrawn appellees' money from the account, and had converted their money to hard assets. Ballard also insisted that appellees execute documents which would show that the money had been a loan to Ballard. Ballard agreed to return appellees' money if they entered into the loan agreement. Ballard also warned Camilli and Strumor that, if they contacted the police, he would disappear with the money. Appellees passed a corporate resolution authorizing Francisco Urrea to make the loan to Summa Texas and to Ballard.

On June 29, 1988, Camilli spoke to Adams, who gave him Bailey's address. Camilli also learned about the transfer of funds to Houston Numismatic. On June 30, Camilli discovered that Ballard's telephone number had been disconnected. On July 1, Camilli spoke to the telephone company in Dallas in an attempt to find an address for Ballard. Camilli also learned that the Jaguar driven by Ballard was registered to Bailey. That day, Camilli flew to Dallas and drove to the address that had been given to him for Ballard. No one was at the house, but Camilli noticed a Jaguar similar to the one he had seen Ballard drive before. At that point, Camilli had no doubt that Ballard and Bailey were the same person. Camilli contacted the Dallas County District Attorney's office.

On July 5, 1988, Camilli again went to the district attorney's office. When Camilli called his office, he learned that Ballard had been calling him every half hour. Camilli called Ballard from the district at-

torney's office. Camilli told Ballard that he would be in Dallas that day and gave Ballard his hotel telephone number. Ballard called Camilli at the hotel late that afternoon and asked where the loan documents were. Camilli said that he had the documents, and Ballard told him to leave them at the hotel's front desk. Ballard contacted Camilli and requested revisions in the documents. On July 6, Ballard called Camilli and told him to leave the revised documents at the front desk. After he received the revised documents, Ballard called Camilli and told him that the next morning he would give appellees what he considered to be their share of the profits on the trades that he had made after converting the money. On July 7, at about 11:00 a.m., Ballard called Camilli and told him that he was ready to turn over the profits. Ballard and Camilli met and discussed the loan documents. Ballard gave Camilli an envelope containing $20,000 cash. Camilli told Ballard that he still expected Ballard to return all of the money by July 15, 1988 pursuant to the loan agreement.

On July 13, Ballard called Camilli and told him that he needed information to wire funds to appellees and told Camilli the amount of money that he planned to wire. Ballard still acted as if he was going to return appellees' funds. Bailey subsequently disappeared, and the money never was returned. Thereafter, police officers arrested Carolina Bailey. Dale flew to Dallas and posted the necessary bonds to bail her out of jail. Criminal charges against Carolina Bailey subsequently were dropped.

## NEGLIGENCE

In its first point of error, Bank argues that there is no evidence to support a finding that it owed a duty to appellees. Bank contends that it owed a duty to appellees only if it undertook an affirmative course of action *for their benefit. See Fort Bend County Drainage Dist. v. Sbrusch,* 818

S.W.2d 392, 395 (Tex.1991); *Colonial Sav. Ass'n v. Taylor,* 544 S.W.2d 116, 119 (Tex. 1976); *Rudolph v. ABC Pest Control, Inc.,* 763 S.W.2d 930, 933 (Tex.App.—San Antonio 1989, writ denied); *Eckman v. Centennial Sav. Bank,* 757 S.W.2d 392, 398 (Tex. App.—Dallas 1988, writ denied). Appellees urge that Bank owed them a duty if it undertook an affirmative course of action *affecting their interests. See Otis Engineering Corp. v. Clark,* 668 S.W.2d 307, 311 (Tex.1983).[3] Bank further asserts in its third point of error that, if we apply its definition of duty, there is no evidence that it undertook an affirmative course of action for the benefit of appellees.

Negligence consists of three essential elements: a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach. *Rosas v. Buddies Food Store,* 518 S.W.2d 534, 536 (Tex.1975). Whether the defendant owes a duty to the plaintiff is a threshold question in any negligence action. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987). The initial question is whether a duty arose in favor of appellees if Bank simply took an affirmative course of action "affecting" appellees, or whether appellees were required to show that Bank took an affirmative course of action for their "benefit."

In *Otis Engineering,* the court imposed a duty because the employer (Otis) performed an affirmative act of control over an incapacitated employee. *See Otis,* 668 S.W.2d at 309. The court stated that one who voluntarily enters an affirmative course of action affecting the interests of another is regarded as assuming a duty to act and must do so with reasonable care. *Id.* at 309, 311. Appellees argue that *Otis Engineering* is a correct statement of Texas law as shown by a "parallel line of cases involving facts similar to the facts in this case—namely failure to disclose information." *See Southeastern Fin. Corp. v. United Merchants & Mfrs., Inc.,* 701 F.2d

---

**3.** Jury question one instructed the jury that Bank owed a duty to appellees if Bank undertook an affirmative course of action *affecting the interests* of appellees, thus following *Otis*

*Engineering.* We note that Bank objected to jury question one at trial and has asserted a point of error complaining of the question.

565, 566 (5th Cir.1983) (per curiam); *First Nat'l Bank v. Small Business Admin.*, 429 F.2d 280, 288 (5th Cir.1970); *Tempo Tamers Inc. v. Crow–Houston Four, Ltd.*, 715 S.W.2d 658, 669 (Tex.App.—Dallas 1986, writ ref'd n.r.e.) (op. on reh'g). Appellees assert that, pursuant to these cases, Bank's partial disclosures and misrepresentations of which it should have been aware imposed a duty to disclose complete and accurate information. *Southeastern Financial Corporation* and *Tempo Tamers, Inc.* involved intentional fraud claims. Here, appellees did not allege fraud claims against Bank. *First National Bank* involved negligent misrepresentation claims. These cases are inapplicable to appellees' negligence claim. Further, none of these cases discusses the applicability of *Otis Engineering*.

Appellees also assert that Bank's argument that *Otis Engineering* applies only to the employer-employee relationship is "doomed to failure" because this Court has quoted with approval the language that Bank contends is an incorrect statement of the law in the jury charge. *See Moore v. Times Herald Printing Co.*, 762 S.W.2d 933, 934 (Tex.App.—Dallas 1988, no writ). We disagree with appellees' reading of *Moore*. Although this Court discussed *Otis Engineering*, we stated that Moore mistakenly relied on that case in attempting to impose a duty on the appellee. *Id.* at 934. Although this Court did not disapprove *Otis Engineering*, it did not expressly approve the language either. Further, *Moore* involved the employer-employee relationship. None of these cases requires application of *Otis Engineering* to the facts of the present case. Texas courts have not expanded *Otis Engineering* to a relationship other than employer-employee. *Crider v. United States*, 885 F.2d 294, 298 (5th Cir.1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2561, 109 L.Ed.2d 743 (1990). We decline to do so in this case.

■ We hold that under our facts the appropriate test for determining whether a duty exists when one allegedly voluntarily assumes a duty to act is as follows: One who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured thereby. *See Fort Bend County Drainage Dist.*, 818 S.W.2d at 395; *Colonial Sav. Ass'n*, 544 S.W.2d at 119; *Rudolph*, 763 S.W.2d at 933; *Eckman*, 757 S.W.2d at 398.

■ We next determine whether there is some evidence that Bank undertook an affirmative course of action for appellees' benefit. A no-evidence point is a question of law. In deciding that question, we consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Jacobs v. Danny Darby Real Estate, Inc.*, 750 S.W.2d 174, 175 (Tex.1988). The jury's findings must be upheld if there is more than a scintilla of evidence to support them. *Stedman v. Georgetown Sav. & Loan Ass'n*, 595 S.W.2d 486, 488 (Tex. 1979). Evidence is no more than a scintilla when it is "so weak as to do no more than create a mere surmise or suspicion of [the fact's] existence." *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 755 (Tex. 1970) (quoting Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361 (1960)). If the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, however, then there is some evidence or, in other words, more than a scintilla of evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). In making its findings, the jury weighs the evidence, assesses the credibility of witnesses, and resolves conflicts and inconsistencies. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986). This Court is not a factfinder, and we cannot substitute our judgment for that of the jury, even if a different answer could be reached on the evidence. *Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

Bank argues that, because Adams never told appellees that he would put a hold on the account, there was no evidence that Bank undertook an affirmative course of action. Appellees argue that Bank misper-

ceives its position and ignores other evidence that the jury considered: (1) Adams informed Camilli that the account was Summa New Mexico's, despite the fact that he knew that the account was in Summa Texas' name; (2) Adams supplied misleading information about Ballard's involvement in the account after being specifically informed by Camilli that Bailey was not authorized to deal in Summa New Mexico's funds; (3) Adams failed to inform Camilli that the funds were not being used to purchase interest-bearing instruments, despite the fact that the written limitation was on his desk; and (4) Camilli inferred from his conversation with Adams that Bank would follow Camilli's instructions, *i.e.*, that Adams would place a hold on the account and would clear future transactions with Camilli.

■ Adams called Summa New Mexico on June 20 because he believed that the company was connected to the account. Adams wanted to determine whether Bank could gain additional business from what he believed to be one of Bank's customers. To the extent that the telephone call was an affirmative course of action, it was for the benefit of Bank, not appellees. Camilli testified at trial concerning his June 20 conversation with Adams. Camilli's testimony shows that Adams never affirmatively stated that Bank would put a hold on the account. Rather, Adams was "noncommittal." However, Camilli "inferred" from Adams' silence that he would put a hold on the account. There is no evidence of the slightest undertaking by Adams or by any other Bank employee to place a hold on the account. The fact that Bank either supplied or failed to supply Camilli with certain account information did not constitute the undertaking of an affirmative course of action for appellees' benefit. In light of the facts of this case, we conclude that there is no evidence that Bank undertook an affirmative course of action for appellees' benefit. We further conclude, therefore, that Bank owed no duty to appellees. We sustain Bank's first and third points. Accordingly, we reverse the trial court's judgment and render a take-nothing judgment for Bank on appellees' negligence claim.

Because we sustain Bank's first and third points of error, we do not reach its remaining points of error concerning appellees' negligence claim.

## NEGLIGENT MISREPRESENTATION

In its twelfth through sixteenth points, Bank argues that there is no evidence to support a finding against it on any of the elements of negligent misrepresentation. It contends that it is undisputed that it gratuitously supplied the information, that no misrepresentations were made, and that appellees did not justifiably rely on the information it provided. Appellees assert that Bank misrepresented and omitted facts concerning the account and that Bank is therefore liable for negligent misrepresentation.

■ The elements of a cause of action for negligent misrepresentation are: (1) the representation is made by the defendant in the course of its business or in a transaction in which it has a pecuniary interest; (2) the defendant supplies false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 234 (Tex.App.—Dallas 1985, writ ref'd n.r.e.) (quoting RESTATEMENT (SECOND) OF TORTS § 552(1) (1977)).

■ The evidence supporting the jury's verdict is as follows. Adams' supervisors told him to obtain a Dun & Bradstreet report on Summa Medical Corporation and to contact the company to determine whether the Bank could get more business. Adams telephoned Summa New Mexico and spoke to Camilli. Adams led Camilli to believe that the account was Summa New Mexico's, although the account in fact belonged to Summa Texas. During his conversation with Camilli, Adams told Camilli that Bailey was authorized on the account. When Camilli told Adams that he did not

know Bailey and that Ballard was the person authorized to act for Summa New Mexico, Adams responded, "Oh yeah, him too." The papers on Adams' desk, however, reflected that only Bailey was an authorized signatory on the account.[4] Camilli testified that, if he had realized that the account was not Summa New Mexico's and that Ballard was not connected to the account, he would have taken action.

First, this information was given in the course of Bank's business. Adams contacted Summa New Mexico to determine whether Bank could get additional business. During this conversation Adams conveyed information about the account to Camilli. This is a sufficient indication that Bank had a pecuniary interest. *See* RESTATEMENT (SECOND) OF TORTS § 552 comment d (1977). It is not necessary that Bank receive consideration for the information at the time that Adams supplied the information to Camilli. *Id.* There is some evidence in the record that this was not, as Bank argues, a gratuitous gesture since Bank sought to benefit by bringing in additional business from the corporation that it believed owned the account.

Next, Adams erroneously indicated that the account was Summa New Mexico's and that Ballard was authorized on the account. This is some evidence that Bank supplied false information to appellees.

Additionally, Adams had the corporate documents and account information when he spoke to Camilli. Thus, Adams was in a position to determine that only Bailey was authorized on the account and that the account was in the name of Summa Texas, not Summa New Mexico. Adams had access to this account information, although Camilli did not. This is some evidence that Adams did not exercise reasonable care or competence in obtaining or communicating the information.

Finally, Camilli testified that, had he known that the account was not Summa New Mexico's and that Ballard was not authorized on the account, he would have taken immediate action to investigate the situation. This is some evidence that Sum-

ma New Mexico justifiably relied on the information supplied to it by Bank. We overrule Bank's twelfth through sixteenth points.

## NEW AND INDEPENDENT CAUSE

In its twenty-second point of error, Bank argues that, even if appellees could establish claims for negligence or negligent misrepresentation, the evidence showed as a matter of law that Bailey's conduct was a new and independent cause of appellees' damages. Thus, Bank asserts, Bailey's criminal conduct relieved it of liability regardless of its alleged negligence.

New and independent cause is an element considered in determining the existence of proximate cause. *McAllen Kentucky Fried Chicken No. 1 v. Leal*, 627 S.W.2d 480, 483 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.). The question of proximate cause is one of fact particularly within the province of the jury, although it may be established as a matter of law if circumstances are such that reasonable minds could not arrive at a different conclusion. *Boyd v. Fuel Distribs., Inc.*, 795 S.W.2d 266 (Tex.App.—Austin 1990, writ denied). A jury's finding on proximate cause will be set aside only in exceptional circumstances. *Yap v. ANR Freight Sys., Inc.*, 789 S.W.2d 424, 425–26 (Tex.App.—Houston [1st Dist.] 1990, no writ).

The jury was instructed as follows concerning proximate cause:

*Instruction No. 5:*

Proximate cause means that cause which, in a natural and continuous sequence, unbroken by any new and independent cause, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event but if the acts or omissions of Joel Bailey were the

4. Ballard's name appeared on Summa Texas' articles of incorporation.

sole proximate cause of [appellees'] loss, if any, then you should not find that any other party proximately caused the losses in question.

*Instruction No. 6:*

New and independent cause means the act or omission of a separate and independent agency, not reasonably foreseeable, which destroys the causal connection, if any, between the negligent act or omission inquired about and the occurrence in question, and thereby becomes the immediate cause of such occurrence.

The jury found that Bank's negligent misrepresentations proximately caused appellees' damages.

Bank asserts that the evidence establishes as a matter of law that Bailey's conduct superseded its alleged negligence because: (1) it was not alleged to have been guilty of any negligent acts or omissions that could have caused harm to appellees without Bailey's intervention since no loss would have occurred had Bailey not stolen the funds; (2) Bailey's conduct was extraordinary since there was no evidence that similar frauds had been committed; (3) Bailey's conduct was entirely independent of its allegedly negligent conduct and was not the normal result of either failing to put a hold on an account or failing to disclose information to a third party; (4) the intervening force, *i.e.*, Bailey's fraudulent conduct, was entirely his own; and (5) Bailey's acts were more than ordinarily culpable because they were criminal and resulted in an award of punitive damages. Bank bases these arguments on the criteria for new and independent cause set forth in section 442 of the Restatement (Second) of Torts and adopted in *Humble Oil & Refining Co. v. Whitten*, 427 S.W.2d 313 (Tex.1968). However, the jury was not instructed to consider each of these factors, and Bank does not complain that the jury instruction on new and independent cause was erroneous. Thus, in ruling on this point of error, we are guided by the instruction given to the jury. *See Fitzjarrald v. Panhandle Pub. Co.*, 149 Tex. 87, 228 S.W.2d 499, 503 (1950); *Casas v. Knorbin*, 218 S.W.2d 289, 291 (Tex.Civ.App.—Galveston 1949, no writ).

In addition to the facts set forth by Bank, the evidence showed that Bank indicated that the account was Summa New Mexico's account and that Ballard was connected to this account. Camilli testified that had Summa New Mexico been made aware of the true facts, *i.e.*, that the account was Summa Texas' and that Bailey was the only person authorized on the account, it could have taken action to investigate the situation and to secure the funds. This evidence would support a finding that Bank's negligent misrepresentations contributed to appellees' loss. The jury was instructed that there could be more than one proximate cause of appellees' loss. From this evidence, reasonable minds could differ as to whether Bailey was the sole cause of appellees' loss. Thus, the evidence does not show as a matter of law that Bailey's conduct was a new and independent cause that relieved Bank of responsibility for appellees' damages. We overrule Bank's twenty-second point.

## DAMAGES

In its twenty-third and twenty-fourth points, Bank argues that there is no evidence or, alternatively, insufficient evidence to support either the submission of a damage question to the jury or the jury's answer to the damage award. Appellees reply that the total amount of their loss is $1,002,000, which is the amount that the jury found constituted their damages.

Bank first asserts that it had no liability to appellees under any of appellees' causes of action and that, therefore, it was improper for the jury to consider damages. We previously held that there is some evidence to support the elements of appellees' negligent misrepresentation claim. Thus, the trial court properly submitted the damage question to the jury on that cause of action.

Bank further asserts that there is no evidence or, alternatively, insufficient evidence to support the jury's answer to the damage award. Jury question four asked: "What sum of money would reasonably compensate [appellees] for the damages, if any, proximately caused by [Bank's] negli-

gence after June 20, 1988 or [Bank's] negligent misrepresentations, if any?" The jury found damages of $1,002,000.

■ The first contact between Bank and appellees was on June 20, when Adams spoke to Camilli. Bank, therefore, could not have supplied any false information to appellees for guidance in a business transaction before June 20. The evidence reflects that, at the beginning of the business day on June 20, 1988, only $760,188 remained in the account. This is the maximum amount that arguably could have been lost as a result of Bank's alleged negligent misrepresentations. Appellees argue that there was evidence that, had the Bank made full and accurate disclosures, appellees would have acted promptly in securing their funds and could have recovered the full amount ($1,002,000) from Bailey. They state that the jury was entitled to believe that they could have prevented their entire loss but for Bank's negligent misrepresentation. We disagree. Because there was only $760,188 in the account at the beginning of business on June 20, 1988, appellees' damages caused by Bank could not have exceeded that amount. We conclude that there is no evidence to support the jury's response to question four. We further conclude that there is insufficient evidence from which this Court can determine the amount of damages. Accordingly, we must remand appellees' negligent misrepresentation claim for a new trial. *See* TEX.R.APP.P. 81(b)(1). We sustain Bank's twenty-third and twenty-fourth points.

### WAIVER

In its twenty-fifth point, Bank argues that the evidence showed as a matter of law that appellees waived their claims by taking intentional action inconsistent with their claims. Alternatively, Bank asserts that the jury's failure to find that appellees waived their claims was against the great weight and preponderance of the evidence.

Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Sun Exploration & Prod. Co. v. Benton,* 728

S.W.2d 35, 37 (Tex.1987). Once waived, a right is lost forever and cannot be reclaimed without consent of the other party. *Burton v. National Bank of Commerce,* 679 S.W.2d 115, 118 (Tex.App.—Dallas 1984, no writ). The issue of waiver is fact intensive. When the party's intent is in dispute, the jury, as factfinder, must weigh the evidence and determine credibility. *See id.* at 118.

■ Camilli testified that the loan document "was being delivered to somebody [Ballard/Bailey] who was pointing a gun at our heads, as far as we were concerned." Francisco Urrea, president and chairman of the board of S.B.F.I., testified that, after Summa New Mexico learned that Ballard had taken the money, Ballard requested that the transaction be made a loan. He stated that Summa New Mexico had a loan document drafted because Ballard informed appellees that he would not return its money unless they signed a note because he did not want to go to jail for stealing the money. Summa New Mexico had no intention to extend a bona fide loan to Ballard. S.B.F.I.'s board of directors passed a resolution authorizing Urrea to execute any and all documents to complete a $1,002,000 loan to Summa Texas and Ballard for the purpose of investing in AA or better commercial paper, so long as the loan was due and payable to S.B.F.I. no later than July 15, 1988. Urrea testified that the loan approved by the board was a "sham" and that Ballard already had stolen the money when the loan was approved. Although the official board minutes do not reflect that the loan was a sham, Urrea testified that the directors discussed off the record that the loan was not bona fide. Urrea testified that the loan document does not reflect the true purpose of the loan because Ballard would not have accepted the deal.

The jury could find from the above evidence that Summa New Mexico neither voluntarily relinquished its rights nor engaged in intentional conduct inconsistent with its rights. Further, any rights appellees may have waived by approving the loan documents would have been against Bal-

lard/Bailey, not against Bank. We conclude that the evidence does not establish as a matter of law that appellees waived their rights against Bank. Further, the jury's finding that appellees did not waive their rights is not against the great weight and preponderance of the evidence. Accordingly, we overrule Bank's twenty-fifth point.

Because we reverse and remand appellees' negligent misrepresentation cause of action, we need not address Bank's points of error complaining of insufficient evidence to support the jury's findings on that claim and of jury-instruction error. Likewise, we do not reach appellees' cross-points contending that the trial court erred in submitting jury questions and instructions on mitigation and that there is no evidence or, alternatively, insufficient evidence to support the jury's answers to those questions.

## CONSPIRACY

In his first point, Dale alleges that the trial court erred in overruling his motion for judgment notwithstanding the verdict because there is no evidence to support the jury's finding that he participated in a civil conspiracy. Specifically, he argues that there is no evidence of a meeting of the minds or of participation by two or more persons, necessary elements in a conspiracy claim. Appellees contend that the jury could find from the circumstantial evidence and inferences from that evidence that Dale participated with Bailey in a conspiracy to defraud them.

A party is entitled to judgment n.o.v. if the opposing party failed to prove an essential element of its claim. *Bishop v. Allied Co.*, 483 S.W.2d 46, 49 (Tex.Civ. App.—Dallas 1972, no writ). In determining whether a motion for judgment n.o.v. was properly overruled, the appellate court should review the record under the no-evidence test. *Douglas v. Panama, Inc.*, 504 S.W.2d 776, 777 (Tex.1974).

An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose by unlaw-

ful means. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). The elements of a conspiracy are: (1) the involvement of two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Id.* A conspiracy requires a meeting of the minds on the object or course of action and some mutual mental action coupled with an intent to commit the act that results in the injury; there must be a preconceived plan and unity of design and purpose. *Ward v. Sinclair*, 804 S.W.2d 929, 931 (Tex.App.—Dallas 1990, writ denied). The defendant must be shown to have agreed with one or more of the other conspirators on the claimed illegal object of the conspiracy and to have intended that it be brought about. *Id.* (citing *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 928 (Tex.1979)). Proof that an individual had some collateral involvement in a transaction and had good reason to believe that there existed a conspiracy among other parties to it is insufficient of itself to establish that the defendant was a conspirator. *Id.* Although a conspiracy may be proved by circumstantial evidence, *Kemp v. Harrison*, 431 S.W.2d 900, 905 (Tex.Civ.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.), disconnected circumstances, any one of which, or all of which, are just as consistent with lawful purpose as with unlawful undertaking, are insufficient to establish conspiracy. *Hicks v. Wright*, 564 S.W.2d 785, 793 (Tex. Civ.App.—Tyler 1978, writ ref'd n.r.e.).

Allen Teel, a private investigator hired by Summa New Mexico to locate Bailey, testified that he saw Dale when Dale bailed Carolina Bailey out of jail on July 19, 1988. Although Teel lost Dale and Carolina Bailey when they left the jail, he found Dale's rental car in front of a restaurant connected to Carolina Bailey's office building. Teel also saw a Jaguar that he had seen Bailey drive on a previous occasion parked in the parking lot. He saw Dale again when police officers talked to Dale in the restaurant parking lot. These were the only times that Teel saw Dale. Teel never saw Bailey that day.

Teel identified Plaintiff's Exhibit 29 as an invoice from the Houston Numismatic Exchange for the sale of 1800 one-ounce gold pieces to Summa Medical Corporation. One of the phone numbers on the invoice was Dale's business number; Bailey had given Dale's telephone number to the Exchange as a number in Houston, Texas, where Bailey could be contacted. The Exchange told Teel that they had reached Bailey at that number. Based on his investigation, Teel learned that Bailey had ordered the coins. The invoice shows that gold coins were delivered to Bailey on June 24 and 27. Teel stated that he was not trying to tell the jury that any of the coins were delivered to Dale.

Dale testified that he had known Bailey for more than fifteen years; they met when Dale lived in Dallas. Dale had known Carolina Bailey for about ten years. Dale and his wife were good friends with the Baileys; they sometimes vacationed together and spent every New Year's together. Dale had lent money to Bailey when Bailey was in financial trouble.

Bailey was in Houston on business the weeks of June 14 and 20, 1988. Dale picked up Bailey at the airport. Bailey stayed at Dale's house, drove one of Dale's vehicles, and worked out of Dale's offices. This was not uncommon; it happened about four to six times per year during their friendship. Dale did not know Bailey's business or that Bailey had opened up an account at Bank. Dale last saw Bailey at his (Dale's) house on June 25. Dale testified that he is aware through testimony at trial that, on June 24, 1988, Bailey picked up 1700 gold coins. He acknowledged that Bailey used his van that day. He also now is aware that 100 gold pieces were to be delivered on June 27, 1988. Bailey had left town on June 25, and Dale neither saw Bailey after that nor received the 100 gold pieces. Dale stated that he did not participate in the purchase of the gold, and he had no knowledge of the purchase. He also stated that he was not involved with Summa Texas.

Dale and his wife flew to Dallas to bail Carolina Bailey out of jail. Dale posted a $20,000 cash bond; he had the money in his safety deposit box because he often bought and sold things and needed the cash for that purpose. Dale also posted a $100,000 security bond using rental property. He bailed out Carolina Bailey because she has been his friend for the past ten years and because she needed help. Bailey has called Dale twice since he disappeared. He called Dale on July 18 and told him that the Jaguar was at the Holiday Inn. After Dale bailed out Carolina Bailey, they went to get the car. Dale and Carolina Bailey went into the club next door.

Carolina Bailey testified that Bailey was secretive about his business and never discussed it with anybody. She stated that she never heard Bailey and Dale discuss business. Representatives of Summa New Mexico testified that Dale had no signatory authority on the accounts involved in this case and that they had neither met nor talked to Dale.

The above evidence shows that Dale and Bailey were friends long before the formulation of the scheme to defraud appellees. The Dales and the Baileys were close personal friends, and Bailey used Dale's house, vehicles, and offices several times per year. Bailey allowed Dale to use his house, car, and office when Dale visited Dallas. Nothing in the record shows that Dale was involved in the purchase of the gold pieces. Although his business telephone number appeared on the Exchange invoice, the evidence shows that the Exchange contacted Bailey, not Dale, at the number. The invoice reflects that both deliveries of gold were made to Bailey, although there is no evidence that Bailey was in Houston on the day that the second delivery was made. Further, Dale's name does not appear on Summa Texas' corporate documents or on documents connected with the account. No one from Summa New Mexico ever had heard of or spoken to Dale. There is no evidence that during their fifteen- or sixteen-year friendship Dale and Bailey did any business together, although Dale had lent Bailey money when Bailey had financial trouble. Carolina Bailey testified that Bailey did not discuss his business with others, including her.

All of the evidence against Dale is as consistent with a lawful purpose as with an unlawful purpose. The evidence against Dale does no more than raise mere surmise or suspicion. Any inferences of Dale's actual knowledge of Bailey's scheme must be based upon evidence of a long-standing friendship. Any inferences of Dale's participation must then be piled on the inferences of actual knowledge. An inference piled on an inference will not support the jury's finding that Dale was involved with Bailey in a civil conspiracy. *See Hicks,* 564 S.W.2d at 794–95. We conclude, therefore, that there is no evidence that Dale participated with Bailey in a civil conspiracy. We further conclude that the trial court erred in not granting Dale's motion for judgment n.o.v. We sustain Dale's first point. Accordingly, we reverse the trial court's judgment and render a take-nothing judgment against appellees on their conspiracy claim against Dale.

Because we sustain his first point, we do not address Dale's remaining points of error.

We reverse and remand in part and reverse and render in part.