**William J. MATTHIESSEN, Paul G. Silber, Jr., Bernard Lee Lifshutz, Jack Pitluk and Earle Cobb, Jr., Appellants & Cross–Appellees,**

v.

**John SCHAEFER, Appellee & Cross–Appellant.**

No. 04–98–00961–CV.

Court of Appeals of Texas, San Antonio.

May 24, 2000.

Rehearing Overruled June 30, 2000.

Earle Cobb, Jr., Thomas H. Crofts, Jr., Ellen B. Mitchell, Crofts, Callaway & Jefferson, P.C., San Antonio, for appellant.

Robert W. Loree, Todd Lipscomb, Law Office of Robert W. Loree, San Antonio, for appellees.

Sitting: PHIL HARDBERGER, Chief Justice, CATHERINE STONE, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by: PHIL HARDBERGER, Chief Justice.

This case involves a contract to sell a 27–acre tract of land. The land lies partially in a federally· designated 100–year flood plain. William J. Matthiessen, Paul G. Silber, Jr., Bernard Lee Lifshutz, Jack Pitluk and Earle Cobb, Jr. (collectively, "the sellers") appeal the trial court's judgment, following a jury trial, that awarded John Schaefer $103,697.40 with interest. We reverse and remand because of an improperly worded jury question.

### BACKGROUND

The sellers own a tract of land located on Ashley Road in San Antonio ("the property"). Six Mile Creek traverses a portion of the property. In 1985, Schaefer signed an earnest money contract with a trustee (who was acting on behalf of the sellers) to purchase the property. Prior to closing, the sellers furnished a survey to Schaefer that showed approximately 5.2 acres of the property to be within the "limits of the 100–yr. flood plain." The parties closed on May 9, 1986.

At closing, Schaefer paid $60,285.98 and executed a deed of trust and promissory note payable to the sellers in the amount of $342,317.52. The promissory note required Schaefer to make annual interest payments in 1987 and 1988. The entire balance matured in 1989. Although Schaefer made the first interest payment in 1987, he did not make any further payments.

Schaefer met with officials of the Department of Housing and Urban Development ("HUD") in January 1989 as he was preparing to build apartments on the property. HUD officials advised him to review flood data compiled by the Federal Emergency Management Agency ("FEMA") before building on the site. Specifically, Schaefer consulted a Flood Insurance Rate Map ("FIRM"). The FIRM contains information regarding the potential for flooding not reflected in the 1986 survey.

After consulting the FIRM, Schaefer discovered that a larger portion of his property than was reflected on the survey was potentially subject to 100–year flooding. According to the FIRM, almost 19 acres were subject to flooding. He was unable to obtain federally guaranteed loans to build apartments in this area; only the 8 acres outside the flood-prone area qualified for government-backed loans.

Because Schaefer had defaulted on the note payment, the sellers gave notice of default, acceleration, and foreclosure of the deed of trust. The sellers then foreclosed the deed of trust; they ultimately purchased it for $240,000, leaving a deficiency on the note of $158,414.32.

The sellers sued Schaefer in 1990 for this deficiency; Schaefer answered the suit alleging defenses including failure of consideration, mutual mistake, and fraud. Schaefer filed his initial counterclaim later that year, alleging violations of the Texas Deceptive Trade Practices Act ("DTPA"), negligent misrepresentation, and breach of contract. The jury returned a favorable jury verdict for Schaefer. On appeal, we reversed the trial court's judgment and remanded due to an error in the jury charge. *See Matthiessen v. Schaefer*, 900 S.W.2d 792, 798 (Tex.App.-San Antonio 1995, writ denied).

The parties tried the case again and the jury again ruled in Schaefer's favor. The jury found that the sellers had committed violations of the DTPA and made a negligent misrepresentation upon which Schaefer relied. The jury found no damages, however, incurred by either Schaefer or the sellers. The trial court disregarded the jury's zero verdict on damages. The

court held that Schaefer owed $158,414.32 on the note, which was excused. The court also found Schaefer suffered damages in the amount of $60,285.98 plus interest, the amount of his initial payment on the note. Rather than awarding damages, the trial court entered judgment for recission of the contract and ordered restoration of Schaefer's initial payment.

The sellers (Matthiessen and Silber) appeal from the trial court's judgment and assert the following arguments that relate to all of the claims underlying the appeal:

- The evidence is legally and factually insufficient to support the jury's finding that the sellers' survey misrepresented the extent of the 100–year flood plain. (Issues 1–2).
- The trial court erred in the admission and exclusion of evidence. (Issues 3–4).

The sellers also raise several issues regarding particular claims or defenses:

*Schaefer's DTPA Claims (Issues 5–9)*

- The evidence is legally and factually insufficient to support the jury's finding regarding Schaefer's discovery of the alleged survey defect (Issue 5).
- The trial court submitted an improperly worded question regarding the discovery rule. (Issue 6).
- Schaefer is not entitled to rescission. (Issue 7).
- The sellers' reliance on the survey is a defense to DTPA damages. (Issue 8).
- The sellers are entitled to a contribution credit because of a pretrial settlement between Schaefer and one of the sellers (who is no longer a party to the suit). (Issue 9).

*Schaefer's Negligent Misrepresentation Claim (Issues 10–12)*

*Schaefer's Defense of Excuse (Issues 13–15)*

The remaining appellants (Pitluk, Lifshutz, and Cobb) incorporate Matthiessen and Silber's brief and raise additional issues without citation to legal authority. Schae-fer brings his cross appeal on the trial court's failure to grant him attorneys' fees under the DTPA. Pitluk, Lifshutz, and Cobb respond that the trial court properly refused to award attorney's fees to Schaefer because he did not prevail on his DTPA claim. The sellers also filed a reply brief.

## DISCUSSION

### 1. Legal Sufficiency of the Evidence Regarding the Survey's Accuracy (Issues 1 and 13)

In their first issue, the sellers assert that no evidence exists to support the jury's finding that the survey misrepresented the 100–year flood plain. In their thirteenth issue, the sellers argue that the jury's answer regarding Schaefer's defense of excuse (as to the nonpayment of the promissory note) is not supported by sufficient evidence.

### a. Standard of Review

■ In reviewing legal sufficiency points, we consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *See Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex.1990). If there is any evidence of probative force to support the finding, the issue must be overruled and the finding upheld. *See In re King's Estate*, 150 Tex. 662, 664, 244 S.W.2d 660, 661 (1951). If there is more than a scintilla of evidence to support the jury's finding, the sellers' no-evidence challenge fails. *See Matthiessen*, 900 S.W.2d at 795; W. Wendell Hall, *Standards of Review in Texas*, 29 ST. MARY'S L.J. 351, 478–49 (1998).

### b. Application

The earnest money contract's sixth paragraph and the survey that Schaefer received before closing are at the heart of this case. The contract requires the sellers to furnish a survey depicting, among

other things, flood information for the property:

"Survey: ... The survey ... *shall show the 100 year flood level of any creek or stream which could flood the Property.* ..."

(emphasis added). The contract also places additional requirements upon the sellers to certify the number of acres that are subject to, as well as the area outside of 100–year flooding:

*The surveyor* shall certify to Buyer ... that the *total area contained within the boundary lines* of such Property is a specified number of acres; *that a specified number of acres within the Property is situated above the 100 year flood level* . ...

(emphasis added).

The survey Schaefer received before closing shows the "approx. limits of 100–yr. flood plain" and states that "approx. *5.2 ac.* [are] contained within limits of 100–yr. flood plain." This acreage comports with the area that FEMA has classified as "Zone A15," an area subject to 100–year flooding according to the FIRM. Yet, FEMA depicts *two* zones of potential flooding on the property. The FIRM shows a second zone, labeled "Zone B," for the property. Zone B, which begins at the boundary of Zone A, reflects the possibility of 100–year flooding with an average depth of less than one foot. Although the 1986 survey shows that only 5.2 acres are subject to 100–year flooding, the FIRM indicates that an additional 13.9 acres are located in FEMA's Zone B and may flood as well. In order to understand the dispute that centers around the contract, survey, and FIRM, the following terms are important:

1. *100–Year Flood Level,* as used by the parties in the contract;

2. *100–Year Flood Limits,* as depicted on the survey; and

3. *FEMA's Definitions of Zone A15 and Zone B.*

   a. In the "Key to Map" on the FIRM, FEMA shows Zone A15 in dark gray and Zone B in light gray. The boundary between the two zones is the "100–Year Flood Boundary."

   b. In the "Explanation of Zone Designations" on the FIRM, FEMA defines the two zones as follows:

   *Zone A1–A30:* Areas of 100–year flood; base flood elevations and flood hazard factors determined. [This is the definition that applies to Zone A15.]

   *Zone B:* Areas between limits of the 100–year flood and 500–year flood; or *certain areas subject to 100–year flooding with average depths less than one (1) foot or where the contributing drainage area is less than one square mile;* or areas protected by levees from the base flood.

(emphasis added).

The Zone B definition is confusing and somewhat contradictory because the first two explanations of Zone B appear to be at odds with each other. The first phrase says that Zone B is the area between the 100–year flood and 500–year flood. This indicates Zone B starts beyond the 100–year level. The second definition of Zone B indicates it is *within* the 100–year flood level, but with depths of no more than one foot. Whether these contradictory definitions should put a diligent buyer on notice that the seller had made false or misleading representations is a jury issue.

Neither of the first or third definitions of Zone B would have required the sellers to designate the 13.9 acres contained in Zone B as part of the 100–year flood limits on the survey. But, if FEMA designated those areas of the property as Zone B because the area has a 1% chance of flooding per year,[1] then the survey should have

---

1. A 100–year flood refers to an event "having a one percent chance of being equalled or exceeded in *any given year.*" 44 C.F.R. § 59.1 (2000) (emphasis added). If a 100–

designated that portion of the property as being within the 100–year flood plain.

Schaefer's DTPA claim, as well as his affirmative defense of excuse, both depend upon a finding that the sellers should have included Zone B as part of the acreage within the 100–year flood plain. Schaefer has the burden on his counterclaim to show the survey inaccurately depicts the 100–year flood plain. *See Wal–Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex.1998); *Modern Exploration, Inc. v. Maddison*, 708 S.W.2d 872 (Tex.App.-Corpus Christi 1986, no writ). The sellers maintain there is no evidence of which of the three definitions FEMA used when it designated the Zone B acreage in dispute. As a result, the sellers assert that Schaefer failed to carry his burden.

■ In setting aside *all* evidence and inferences that are contrary to the jury's finding, we are able to discern at least a scintilla of evidence that supports the jury's result. Schaefer's expert, Harry Jewett ("Jewett"), testified that he would have shown both the Zone A and Zone B that relate to the property on the survey "because that would meet the criteria of the contract." The terms of the contract required the sellers to disclose "the 100 year flood level of any creek or stream which could flood the Property." The only reason that Zone B would be mandated by the terms of the contract is if the area within Zone B on this property were subject to 100–year flooding. No other definition of Zone B would result in Jewett's conclusion that its disclosure is necessary to abide by the terms of the contract.[2] As a result of Jewett's statement (that he would have depicted "the B Zone, because that would meet the criteria of the contract"), the jury could have concluded that the Zone B on this property was one in which 100–year flooding occurs.

The jury had other evidence to consider in arriving at its finding. Our review of the evidence's legal sufficiency requires us to set aside all contrary evidence to the jury's finding. The sellers disputed Schaefer's understanding of Zone B. They cross-examined Jewett and developed other evidence to that end. But, the jury did not agree with the sellers' argument. There is some evidence that supports the jury's finding. We will not disturb the jury's finding under the evidence before us. *See Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28 (Tex.1993); *Matthiessen*, 900 S.W.2d at 796. We overrule the sellers' first and thirteenth issues. We need not reach the sellers' second, fourteenth, or fifteenth issues.

## 2. *Negligent Misrepresentation*

### a. *Legal Sufficiency*

■ In their tenth issue, the sellers attack the legal sufficiency of the evidence that supports the jury's finding on Schaefer's negligent misrepresentation claim. Negligent misrepresentation requires that: (1) the speaker make a representation in

year flood occurs in year 1, a one percent chance still exists that a 100–year flood will occur in year 2.

2. During oral argument, the sellers invited us to apply the equal inference "rule" in order to find that no evidence exists to support the jury verdict. The sellers allege that because insufficient evidence exists to rule out the other definitions of Zone B, then Schaefer *cannot* claim that the land lies in the 100–year flood plain subject to one foot of flooding. We do not reach this issue, but if we did, the "reasonable minds" rule is more helpful in resolving the point than trying to measure what an "equal inference" is. "The test for

the application of this no evidence/scintilla rule is that if reasonable minds cannot differ from the conclusion that the evidence offered to support the existence of a vital fact lacks probative force, it will be held to be the legal equivalent of no evidence. However, there is some evidence, more than a scintilla, if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds as to the existence of the vital fact." *Kindred v. Con/Chem., Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). Reasonable minds could reach the conclusion that the applicable definition is that of 100–year flooding up to one foot in height.

the course of its business or in a transaction in which it had a pecuniary interest; (2) the representation was false and offered as business guidance; (3) the speaker did not exercise reasonable care or competence in obtaining or communicating the information; and (4) another party suffers pecuniary loss by justifiably relying on the representation. *Southwestern Clinic of Bone & Joint Diseases v. Farmers Ins. Group*, 850 S.W.2d 750, 753 (Tex.App.-Corpus Christi 1993, no writ); *First Interstate Bank of Texas, N.A. v. S.B.F.I., Inc.*, 830 S.W.2d 239, 245 (Tex.App.-Dallas 1992, no writ). The sellers complain that no evidence exists to support the third element: Whether the sellers used reasonable care in communicating the information to Schaefer.

■ We find the evidence is legally sufficient. The sellers claim that Schaefer failed to use reasonable care in discovering the possibility of a problem with Zone B. We agree that is a jury issue. But, the sellers had a duty to disclose flooding problems and did not do so. Whether they were guilty of negligent misrepresentation is also a jury question. The jury found that negligent misrepresentation existed and there was some evidence to support their answer. We overrule the sellers' tenth issue.

### b. Whether Schaefer's Injury Is Inherently Undiscoverable

■ In their eleventh issue, the sellers argue that the discovery rule should not apply to Schaefer's claim of negligent misrepresentation because his injury is not inherently undiscoverable. We disagree. The discovery rule applies to the claim of negligent misrepresentation if: "(1) the injury is inherently undiscoverable; and (2) the evidence of the injury is objectively verifiable." *Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 531 (Tex.1997). The sellers do not dispute that Schaefer's injury is objectively verifiable, so we consider only whether Schaefer's injury is inherently undiscoverable.

■ In order for an injury to be inherently undiscoverable, "an injury need not be absolutely impossible to discover." *S.V. v. R.V.*, 933 S.W.2d 1, 7 (Tex.1996). "Discovery of a particular injury is dependent ... on the circumstances in which [the injury] occurred and plaintiff's diligence as well." *Id.* As we decide below in discussing the DTPA discovery rule, a jury could have concluded that Schaefer should have discovered the injury in 1986. The issue for us here is likewise narrow in scope. Was the injury inherently undiscoverable?

■ For purposes of the discovery rule applicable to negligent misrepresentation, Schaefer exercised sufficient diligence to show that the injury was difficult (although not impossible) to discover. The parties contracted for the sellers to provide a survey to Schaefer containing flood data relating to the property. The sellers failed to do so. Schaefer explained to the sellers that their first survey did not show the necessary flood data required by the contract. The sellers' third attempt at producing a survey was successful in communicating flood information, but not the *correct* flood information. The surveyor-acting as a neutral third party-certified that the survey properly showed the limits of the 100–year flood plain.

Schaefer's due diligence was satisfied when he obtained a survey that he reasonably thought complied with the terms of the contract. Because Schaefer's ability to discover the injury need not be an impossibility for the negligent misrepresentation discovery rule, no conflict in reasoning exists when we conclude, below, that a scintilla of evidence exists from which a jury could have decided that Schaefer should have discovered the injury in 1986.

The sellers argue that we should extend the holding of *HECI Exploration Co. v. Neel* to the present case. *See HECI Exploration v. Neel*, 982 S.W.2d 881, 887 (Tex.1998) (stating that "filings and other materials publicly available from the Railroad Commission area ready source of in-

formation, and a cause of action for failure to provide that same information is not inherently undiscoverable"). We did not locate evidence that the materials containing flood data were publicly available or that they existed as a matter of public record.

We overrule the sellers' eleventh issue.

### 3. The Jury Question Regarding the Discovery Rule is Improper

In their sixth issue, the sellers argue that the trial court erred in submitting an improperly worded question to the jury that asked when Schaefer discovered or should have discovered the existence of Zone B on his property. The following discussion from our previous opinion is helpful in understanding the context of the sellers' issue:

> Schaefer received the survey prior to closing. The closing occurred on May 9, 1986, before which any misrepresentation necessarily occurred. Schaefer testified that he did not learn of any misrepresentation until sometime in January or February of 1989. Appellants filed suit on January 31, 1990. Schaefer filed his counterclaim on November 21, 1990. . . .

> The accrual of the [counterclaim], however, depends upon a proper application of the discovery rule. Accordingly, Schaefer had the burden of obtaining a finding that he did not discover and should not have discovered the basis for his counterclaim until a time within the limitations period. *See Willis v. Maverick*, 760 S.W.2d 642, 646–47 (Tex.1988).

*Matthiessen*, 900 S.W.2d at 796–97. If Schaefer discovered, or should have discovered, the injury before November 21, 1988, his suit is barred by limitations.

During the second trial, the court submitted the following question to the jury:

> When did John Schaefer discover or, in the exercise of reasonable diligence, should he have discovered the existence

of Zone B which affects the Ashley Road property?

The jury answered, "Jan. or Feb. of 1989."

■ This question is improperly worded. The date written in by the jury could refer to when Schaefer should have discovered the flooding problem or when he did discover the problem. It is possible it is the same date, but we do not know that either. We cannot tell which question the jury answered, and we must know the earlier of the two possible dates for statute of limitation purposes. *See Matthiessen*, 900 S.W.2d at 797. Determining the date Schaefer should have discovered that the survey did not comply with the terms of the contract is critical. If Schaefer should have known in 1986, the suit is beyond the statute of limitations. If he should have discovered the problem in 1989 (when he did discover it), then the case is timely filed. The pattern jury charge ("PJC") solves this dilemma by simply asking when the aggrieved party *should* have discovered the misrepresentation. This will always be the earlier date unless the "should have discovered" and the actual discovery are the same date. Perhaps this is what the jury meant in this case, but we cannot tell by the question asked. There must be a question that allows the jury to answer when Schaefer "should have discovered" alone. This date starts the statute of limitation clock running.

The applicable PJC first asks the following:

> Did [the sellers] engage in any false, misleading, or deceptive act or practice that was a producing cause of damages to [Schaefer]? ["Producing cause" and "False, misleading, or deceptive act or practice" defined.] Answer:_____

4 TEX. PATTERN JURY CHARGES 102.01 at 102–3 (1993). The PJC for the discovery rule then reads:

> If your answer to [the previous question] is "Yes," then answer the following question. Otherwise, do not answer the following question.

By what date should [Schaefer], in the exercise of reasonable diligence, have discovered all the *false, misleading, or deceptive acts or practices* of [the sellers]?

Answer with a date in the blank below.

Answer: _____

*Id.* 102.23 at 102–38; *see Willis v. Maverick*, 760 S.W.2d 642, 647 (Tex.1988).

▮ Schaefer argues that the sellers waived this issue because they did not present it to the trial court. The sellers objected to the jury question and asked the trial court to tender two separate questions, one for when the injury was discovered and one for when the injury should have been discovered. This objection and tender was sufficient to call the trial court's attention to the error. *See Matthiessen*, 900 S.W.2d at 797–98.

The sellers also argue the jury question should refer to a misrepresentation or inaccuracy in the survey rather than the existence of Zone B. We agree. Merely discovering the existence of Zone B on the property is not the issue. Rather, Schaefer's allegation that the survey did not comply with the terms of the contract is the crux of his argument. Schaefer's knowledge of Zone B's existence may not have *necessarily* led him to discover the existence of the alleged inaccuracy in the survey. The jury must consider whether Schaefer, in the exercise of reasonable diligence, *should have discovered* the alleged inaccuracy in the survey. An ideal question is one that would allow the jury to determine when Schaefer should have discovered that the survey he received before closing did not comply with the sixth paragraph of the contract.[3]

The jury charge as presented was improperly worded and does not allow the court to determine the earliest date that Schaefer should have discovered his injury.

In order for this court to affirm this judgment we would have to find, as a matter of law, that the "should have" date and the actual discovery date are one and the same: "Jan. or Feb. of 1989." As there is some evidence that the flooding problem was revealed by the FIRM in 1986, we would have to ignore this evidence and take the evidentiary finding away from the jury. This we cannot do. We hold that there is enough evidence in answer to the "should have" question to support a finding of 1986 or 1989. The sellers tried to get the trial court to submit two questions and pointed out the problem with asking both questions in one. We do not agree that two questions must be asked, but we do agree there is error in submitting both questions with only one answer blank. PJCs 102.01 and 102.23 provide the most accurate guide for questioning the jury on when Schaefer should have discovered the alleged inaccuracy in the survey. *Cf. Texas Employers Ins. Ass'n v. Duree*, 798 S.W.2d 406, 413 (Tex.App.-Fort Worth 1990, no writ) (explaining that the PJC's are "not an exhaustive list of issues and instructions appropriate for all cases," and that deviation from the PJC's would be necessary "where there is no *appropriate* pattern charge" (emphasis added)). In the present case, an appropriate pattern charge exists.

Schaefer received three surveys in the months prior to closing. The third survey, which Schaefer received on March 3, 1986, showed flood plain information on the property. Yet, Schaefer testified that this survey does not depict Zone B. Indeed, this survey does not show "Zone B" and is generally similar to earlier versions. But, this survey contains the following language not contained in the earlier versions:

> *NOTE: . . .*

---

**3.** The jury would pursue such a question if it answers "Yes" to a threshold question patterned after PJC 102.01 ("Did [the sellers] engage in any false, misleading, or deceptive act or practice" that was a producing cause of damages to [Schaefer]? ["Producing cause" and "False, misleading, or deceptive act or practice" defined.] Answer:_____"). 4 Tex. Pattern Jury Charges 102.01 at 102–3 (1993).

*FLOOD PLAIN INFORMATION IS TAKEN FROM*

*THE FLOOD INSURANCE RATE MAP ["FIRM"]*

*COMMUNITY PANEL NO. <u>480045 0057 B</u>*

*FOR SAN ANTONIO, TEXAS.*

(Capitals, underline, and font are approximate depictions of the original). The FIRM shows a gray shaded area with **"ZONE B"** over a large part of the area bounded by Ashley Road and Six Mile Creek. There is a clear difference between the area covered by Zone B on the FIRM and the limits of the 100–year flood plain on the survey.

The survey's reference language to the FIRM *may, or may not have,* placed Schaefer "using reasonable diligence" on notice. For the purposes of the DTPA discovery rule, whether Schaefer should *have discovered* the FIRM in 1986 is a question of fact to which we have no answer. We sustain the sellers' sixth issue and need not reach their third, fourth, fifth, seventh, eighth, ninth, and twelfth issues.

### CONCLUSION

Because the trial court submitted an improper question to the jury, and the jury could have answered either 1986 or 1989 if the question had been worded properly, we reverse and remand.

Dissenting opinion by: KAREN ANGELINI, Justice.

KAREN ANGELINI, Justice, dissenting.

Because I believe the evidence is legally insufficient to show that the sellers failed to comply with the provisions of the contract in question, I respectfully dissent.

At issue is whether the survey the sellers supplied to Schaefer as required by the parties' contract misrepresented the 100–year flood plain because it did not include Zone B. The critical language in dispute is

FEMA's definition of Zone B, which is as follows:

> Zone B: Areas between limits of the 100–years flood and 500–years flood; or certain areas subject to 100–year flooding with average depths less than one (1) foot or where the contributing drainage area is less than one square mile; or areas protected by levees from the base flood.

The majority notes that the first two of the three Zone B area classifications are somewhat contradictory and at odds with each other. Further, the majority states that neither the first nor the third designations of Zone B would require the seller to designate the disputed property as part of the 100–year flood limits on the survey. While I agree with the majority in this regard, I reach a different conclusion. I conclude that the three FEMA classifications of Zone B are three separate and distinct classifications. And, because FEMA identified the area in dispute as Zone B property with no breakdown as to the three classifications, it is impossible to tell whether the property in dispute falls within the first, second or third classifications or some combination thereof. There is simply no evidence that any part of Zone B falls within the 100–year flood plain. It is just as likely that some part of Zone B falls within the 100–year flood plain as not. *See Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998) (if the evidence supports equally probable but opposite inferences, it is speculative and amounts to no evidence). Accordingly, Schaefer has failed to meet his burden of showing that any part of the property in dispute fell within the second Zone B designation and, therefore, he has presented no evidence that the sellers failed to comply with the contract requiring them to provide him with information regarding the 100–year flood plain on the property.

The majority considers Henry Jewett's expert testimony as some evidence that the failure of the sellers to include Zone B in the survey amounted to a misrepresen-

tation. Jewett testified that if he were preparing the survey required by the contract, he would include Zone B "because that would meet the criteria of the contract" and "[b]ecause part of the definition of B Zone contains language for the 100–year flood plain". However, the fact that Jewett would have included it does not render the survey supplied by the sellers to be inaccurate or to amount to a misrepresentation. And, as noted above, FEMA's definition of Zone B does not indicate that the subject property is located within any particular one of the three designations.

Jewett further testified that his investigation included a visit to the property to observe a high water mark. He admitted, however, that he had not made a determination as to what areas of Zone B are subject to 100–year flooding. This testimony amounts to no evidence· that the sellers made a misrepresentation by excluding Zone B from the survey.

For the above-stated reasons, I would reverse and render judgment in favor of the sellers.