*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*





## OPINION

No. 04-10-00911-CV

**CAMP MYSTIC, INC.**, and Richard G. Eastland,
Appellants

v.

S. Stacy **EASTLAND**,
Appellee

From the 198th Judicial District Court, Kerr County, Texas
Trial Court No. 10905B
Honorable David Peeples, Judge Presiding

Opinion by:  Karen Angelini, Justice

Sitting:  Catherine Stone, Chief Justice
Karen Angelini, Justice
Rebecca Simmons, Justice

Delivered and Filed:  June 20, 2012

REVERSED AND REMANDED

This appeal arises from the trial court's granting of S. Stacy Eastland's traditional and no-evidence motion for summary judgment. Because we hold that Stacy failed in his burden to prove that he was entitled to summary judgment as a matter of law and because there was evidence in the record sufficient to defeat the no-evidence motion for summary judgment, we reverse the trial court's judgment and remand the cause for further proceedings consistent with this opinion.

## BACKGROUND

Camp Mystic, a camp for girls that is family owned and operated, has been in existence for almost 100 years. Before its reorganization, the shareholders of Camp Mystic, Inc. were Richard G. Eastland ("Dick") (who owned 38%), S. Stacy Eastland ("Stacy") (who owned 8%), their sister Nancy Leaton (who owned 8%), their mother Anne Eastland as trustee (who owned 42%), and two of their cousins (who each owned 2%). In the late 1990s, after an incident involving a camper, the family became concerned about liability issues. Thus, Stacy, a lawyer, advocated a reorganization of the corporation. Stacy drafted the reorganization documents and represented all sides in the transaction. Under the reorganization, the old corporation, Camp Mystic, Inc., was renamed to Natural Fountains Properties, Inc. ("NFP"), and a new corporation, also called Camp Mystic, Inc. ("New CM"), was created to operate the camp. The shareholders of New CM were Dick and his wife Tweety.

Upon the reorganization, New CM operated the camp and took on the risks of camp operations. NFP continued to own the real estate on which the camp operated and leased the land to New CM pursuant to the Ground and Building Lease ("the Lease"), which was drafted by Stacy. While reducing liability to NFP was one of the goals of the reorganization, it was not the only goal. Other goals included giving Dick and Tweety, the operators of the camp, the ability to have ownership and independence. For example, they were no longer required to approach the Board each year with regard to salary issues. Another goal of the reorganization was to reward Dick and Tweety with profits if they ran the camp well, so that the camp would grow and extend beyond this generation. Another goal was to give the capital owners the same amount of dividends they had previously experienced. Dick and Stacy's mother wanted reassurance that she would continue to receive the same amount of dividends after reorganization that she had

received previously. Thus, a complicated rent formula was created to make sure the dividends continued each year in the same amount as the year of the reorganization.

The parties operated under these agreements without conflict for almost ten years. Each year, Dick approached the Board (which consisted of Dick, Stacy, Nancy, and other family members) and proposed the rent for the following year. Each year the Board agreed to the amount of rent. Then, Dick decided to expand the camp by creating a second camp on the property. When a neighbor heard that the new camp would be near his boundary, he went to Dick and proposed giving the camp money to not put the new camp on the proposed site. In exchange for the camp agreeing to restrictions of use on the property near his land and to put the new camp on a different site, the neighbor offered to pay an amount that would enable the camp to build the second camp without having to obtain a loan. A dispute arose over how much of these proceeds should go to New CM and how much should go to NPF. This dispute then caused Stacy to reevaluate the amount New CM was paying to NFP in rent. He determined that the rent formula, as set forth in the Lease, had not been followed and that New CM was in default on the Lease. In response to these accusations, New CM and Dick filed a declaratory judgment action, seeking a declaration of rights under the Lease. Stacy and other minority shareholders counterclaimed, alleging that Dick had improperly used the Camp Mystic trademark, had breached the Lease and his fiduciary duties owed to NFP, and was in conflict of interest because of his ownership and positions in both New CM and NFP.

## A.    Allegations Against Stacy

New CM and Dick then countersued Stacy for professional negligence, breach of fiduciary duty, and negligent misrepresentation. New CM and Dick had five basic complaints about Stacy's preparation of the Lease: (1) the lease term; (2) the rent provision; (3) the

enforceability of the lease; (4) the Camp Mystic trademark; and (5) conflicts of interest not disclosed by Stacy.

1.  The Lease Term

The basis for New CM and Dick's claims arising from the term of the Lease was Stacy's advice to Dick that the Lease had a "five-year rollover term." In his deposition, Dick testified that Stacy repeatedly told him the Lease had a five-year rollover term. He also testified what he understood a five-year rollover term to mean:

> Five year rollover lease means that if I got terminated today, I would have five years to operate the camp before I'd have to vacate the premises. And that would give me time to find another place. Now, it also means that every year, when the lease was renewed . . . that meant I got an additional five years. That's what I was led to believe by Stacy. . . . [Stacy] assured me that I had a five-year rollover lease and I went on that. He's my brother. He's my lawyer. That's what I wanted. I thought that's what I got.

Thus, according to Dick, Stacy represented to him that his lease was renewed every year for an additional five years and that if his lease was terminated, he would have five years to vacate the premises. The Lease, however, does not state what Dick claims Stacy represented to him:

> Section 1.03. TO HAVE AND TO HOLD the Demised Premises unto Tenant, and, subject to the limitations set out in this Lease, to Tenant's successors and assigns, all subject to the exceptions and reservations set out in this Lease, for a term commencing as of the date hereof [June 1, 1998] and ending at midnight on September 1, 2001, or on such earlier date as may be otherwise set forth in this Lease, upon and subject to the covenants, agreements, terms, provisions and limitations herein set forth, all of which Tenant covenants and agrees to perform and observe.

> Section 1.04. The term of this Lease will be automatically extended by one year on each September 1 unless (i) a default by Tenant (or circumstances which, if not cured after notice or opportunity to cure, would become such a default) exists or (ii) written notice by Tenant or Landlord that the term of the Lease will not be extended (such written notice may be given with or without cause has been given not later than the preceding September 1. Any such extension shall be upon the same terms and conditions of this Lease as those applicable during the initial term.) [T]he Demised Premises will be provided in its then existing condition on an "as is" basis at the time the renewal term commences.

According to Dick, he did not have reason to suspect that Stacy's advice that the Lease had a five-year rollover term might be wrong until early 2006, when other counsel he retained reviewed the lease.

### 2. Rent Provision

The rent provision of the Lease provides the following:

Section 3.02. The annual rent due (herein called "Annual Rent Due") hereunder shall be that certain product obtained by multiplying the Replacement Cost of the Demised Premises on January 1 of each year, as reasonably determined by Landlord, by the greatest of the then (i) Federal Short-Term Rate; (ii) Federal Mid-Term Rate; (iii) Federal Long-Term Rate or (iv) six and one-half percent (6.5%). If there is any dispute in any year as to the Replacement Cost of the Demised Premises, it shall be resolved by arbitration pursuant to procedures outlined in Exhibit 2 and incorporated herein with rent being payable based on Landlord's determination until resolution of the issue, with an appropriate cash adjustment (if necessary) being made within 30 days thereafter. For the remaining period of 1998, the Annual Rent Due shall be Three Hundred Thousand Dollars ($300,000).

The Lease defines the following:

"Demised Premises" is "the Demised Land and the Buildings."

"Demised Land" is "those certain lands known generally as Camp Mystic being described in Exhibit 1 attached to this Lease and made a part hereof, together with all easements and rights appurtenant thereto."

"Buildings" are "all buildings, equipment, machinery, fixtures, appurtenances, and other improvements from time to time located on the Demised Land and used in connection therewith, and any and all other buildings, improvements and structures, equipment, machinery, fixtures, appurtenances at any time constructed upon the Demised Land, or affixed or attached to and used in connection with the Demised Land, and any and all renewals and replacements thereof, additions thereto and substitutes therefor."

"Replacement Cost of the Demised Premises" is "the then current cost (construction, architectural, engineering or otherwise) of replacing the Demised Premises minus the then current cost of an additional building(s) constructed after March 1, 1998, that are not renovated buildings."

Dick alleged that Stacy, both before and after the 1998 reorganization, told him how to prepare and calculate the rent New CM owed NFP under the Lease. Stacy allegedly told Dick to calculate the NFP shareholders' dividends for 1997, and then determine a rent that would allow the shareholders to receive the same amount of rent in future years that they received as dividends in 1997. According to Dick, he followed this advice and Stacy's further advice on periodic rent adjustments resulting from operational expenses. Each year at the NFP Board meeting, Dick presented the rent calculation spreadsheets to the Board, as advised by Stacy. Dick alleged it was not until he received a letter from Stacy's attorney on March 9, 2007, that he had reason to know that Stacy and other NFP minority shareholders believed that New CM owed an additional $2.8 million in rent for 1999 to 2006, and was in default. Thus, Dick alleged that Stacy made misrepresentations and gave negligent advice regarding the calculation of the rent.

### 3.      Enforceability of Lease

As the attorney for New CM and Dick, Stacy was responsible for preparing the Lease. New CM and Dick claimed that Stacy gave wrongful advice regarding the validity and enforceability of the Lease. In an accelerated appeal, this Court held that the arbitration provision contained within the Lease was not enforceable. *See Eastland v. Camp Mystic, Inc.*, No. 04-08-00675-CV, 2009 WL 260523, at *4 (Tex. App.—San Antonio 2009, pet. denied). In reviewing the rent and arbitration provision, we noted that the "replacement cost" of the "real estate is not ascertainable because 'replacement cost' cannot be assigned to real property since real property is individually unique and is not replaceable." *Id.* Thus, we held that because of this language used in the Lease, the arbitration agreement was not enforceable. *Id.* The trial court has since

ruled that the rent provision is enforceable but ambiguous and that its meaning should be determined by a jury.[1]

### 4. Trademark

New CM and Dick claimed that Stacy failed to draft reorganization documents that unambiguously conveyed the Camp Mystic trademark to New CM and that Stacy failed to disclose to New CM that Stacy did not intend for New CM to own the trademark.

### 5. Conflict of Interest

New CM and Dick alleged that Stacy improperly represented all sides in negotiating and preparing the Lease and Conveyance without disclosing or obtaining a waiver of conflicts. They alleged that Stacy represented all sides to both transactions, even though he would benefit financially from any benefits given to NFP (in which he was a shareholder) at the expense of New CM (in which he was not a shareholder). According to New CM and Dick, Stacy put Dick in a position that would create conflict by the way Stacy crafted the reorganization. They emphasize that Stacy reorganized Camp Mystic so that Dick owned 100% of New CM while at the same time Dick owned 38% of NFP and served on its Board. According to New CM and Dick, Stacy knew that Dick would inherit stock from their mother, which would result in a 52% ownership in NFP. Dick alleged that Stacy did not disclose these conflicts to his clients.

### B. *Motions for Summary Judgment*

In response to New CM and Dick's allegations, Stacy filed a traditional motion for summary judgment, arguing that limitations barred the causes of action against him. He also filed a no-evidence motion for summary judgment on the grounds that there was no evidence of the breach, causation, or damages elements of New CM and Dick's claims for legal malpractice,

---

[1] The underlying case went to trial on January 17, 2011, and a jury returned a verdict on February 10, 2011. The jury found that "Replacement Cost of Demised Premises" is the replacement cost of existing buildings (not including post-March 1998 improvements) plus the reasonable cost of replacing the land with similar Hill country land.

breach of fiduciary duty, and negligent misrepresentation. The trial court granted both of Stacy's motions and then severed New CM and Dick's claims against Stacy from the underlying case. New CM and Dick then appealed.

### TRADITIONAL MOTION FOR SUMMARY JUDGMENT

At issue is whether the respective statutes of limitations bar New CM and Dick's claims for professional negligence, breach of fiduciary duty, and negligent misrepresentation.[2] Generally, when a cause of action accrues is a question of law. *Provident Life & Accidental Inc. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003). "[A] cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy." *Id.* "In most cases, a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur." *Id.* However, two exceptions may defer accrual of a claim: the discovery rule and the doctrine of fraudulent concealment. Here, New CM and Dick have pled the discovery rule.

#### A.       *Standard of Review*

We review the trial court's grant of summary judgment de novo. *Provident*, 128 S.W.3d at 215. When reviewing a summary judgment, we take as true all evidence favorable to the respondent, and we indulge every reasonable inference and resolve any doubts in the respondent's favor. *Id.*

"A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense." *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). "Thus, the defendant must (1) conclusively prove

---

[2] We note that in his motion for summary judgment, while Stacy asserted that New CM and Dick had "improperly attempted to fracture legal malpractice claims" into additional claims for breach of fiduciary duty and negligent misrepresentation, he specifically stated that he was not seeking summary judgment on this ground. Instead, Stacy's motion stated that he was treating each claim against him "as if it were properly a separate cause of action." Thus, whether the legal malpractice claims have been improperly fractured is not at issue in this appeal.

when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury." *Id.* If the movant establishes that the statute of limitations bars the action, the respondent must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations. *Id.*

New CM and Dick filed their claims against Stacy in October 2007. Those claims were for professional negligence, negligent misrepresentation, and breach of fiduciary duty. The statute of limitations for the first two claims of legal malpractice and negligent misrepresentation is two years. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.003(a), 16.004(a)(5). The statute of limitations for the third claim of breach-of-fiduciary claim is four years. *See id.* § 16.004(a)(5). Thus, in this case, to prevail on his affirmative defense of limitations, Stacy must have conclusively proven in his motion for summary judgment when the cause of action accrued and if applicable, negate the discovery rule. That is, his motion must have shown as a matter of law that New CM and Dick discovered, or in the exercise of reasonable diligence should have discovered the nature of their wrongfully-caused injuries before October 2005 (for legal malpractice and negligent representation) and before October 2003 (for breach of fiduciary duty). *See KPMG Peat Marwick*, 988 S.W.2d at 748.

B.      *Does the discovery rule apply?*

Stacy claims that the discovery rule does not apply when the fiduciary's alleged misconduct was readily discoverable. According to Stacy, even though there is evidence that Stacy repeatedly told Dick that the Lease contained a five-year rollover term, Dick still had the duty to read the Lease. And, according to Stacy, if Dick had just read the Lease, Dick would

have realized that the Lease did not, in fact, contain a five-year rollover term. We note that Stacy admits he mistakenly told Dick that the lease contained a five-year rollover term.

The Texas Supreme Court has stated that the discovery rule applies in legal-malpractice cases. *Apex Towing Co. v. Tolin*, 41 S.W.3d 118, 120-21 (Tex. 2001). When the supreme court first held that the discovery rule applies to legal malpractice cases, the court emphasized that an "attorney is obligated to use the skill, prudence, and diligence commonly exercised by practitioners of his profession." *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988). The court explained that the "corollary to this expertise is the inability of the layman to detect its misapplication; the client may not recognize the negligence of the professional when he sees it." *Id.* (citation omitted). According to the supreme court, "It is unrealistic to expect a layman client to have sufficient legal acumen to perceive an injury at the time of the negligent act or omission of his attorney." *Id.* (quotation omitted). The court noted that the "special relationship between an attorney and client further justifies imposition of the discovery rule." *Id.* "A fiduciary relationship exists between attorney and client." *Id.* "As a fiduciary, an attorney is obligated to render a full and fair disclosure of facts material to the client's representation." *Id.* "The client must *feel free to rely on his attorney's advice*." *Id.* (emphasis added). "Facts which might ordinarily require investigation likely *may not excite suspicion where a fiduciary relationship is involved*." *Id.* (emphasis added). "Further, breach of the duty to disclose is tantamount to concealment." *Id.*

The supreme court then noted that were it "to follow the general rule, the client could protect himself fully only by ascertaining malpractice at the moment of its incidence." *Id.* at 646. "To do so, he would have to hire a second attorney to observe the work of the first." *Id.* "This costly and impractical solution would but serve to undermine the confidential relationship

between attorney and client." *Id.* Thus, the court found that "any burden placed upon an attorney by application of the discovery rule is less onerous than the injustice of denying relief to unknowing victim." *Id.* Accordingly, it held "that the statute of limitations for legal malpractice does not begin to run until the claimant discovers or should have discovered through the exercise of reasonable care and diligence the facts establishing the elements of his cause of action." *Id.*

We further note that the discovery rule also applies to claims of breach of fiduciary duty and negligent misrepresentation. *See id.* at 645-46 (breach of fiduciary duty); *Matthiessen v. Schaefer*, 27 S.W.3d 25, 31 (Tex. App.—San Antonio 2000, pet. denied) (negligent misrepresentation). In explaining why the discovery rule applies to breach of fiduciary duty, the supreme court noted that "a person to whom a fiduciary duty is owed is either unable to inquire into the fiduciary's actions or *unaware of the need to do so*." *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996) (emphasis added). Thus, "a person to whom a fiduciary duty is owed is relieved of the responsibility of diligent inquiry into the fiduciary's conduct so long as the relationship exists." *Id.*; *see also West v. Proctor*, 353 S.W.3d 558, 566-67 (Tex. App.—Amarillo 2011, pet. denied). However, once "the fact of misconduct becomes apparent, it can no longer be ignored, regardless of the nature of the relationship." S.V., 933 S.W.2d at 8. Thus, we conclude that New CM and Dick had no duty to read the Lease and could rely on Stacy's alleged misrepresentations. *See West*, 353 S.W.3d at 568 (holding that it was reasonable for property owner to trust that her fiduciary negotiated the lease in accordance with the terms that she had agreed to and that property owner was under no duty to read the lease prior to signing it).

Stacy also argues that "by simply reading the Lease Appellants could have discovered that the rent provision was something other than Appellants now contend it should have been." Dick responds that even if he had a duty to read the Lease and discover that Stacy had

misrepresented the rent provision, the meaning of the rent provision could not have been clear to a layman like him. We note that in *Eastland v. Camp Mystic, Inc.*, No. 04-08-00675-CV, 2009 WL 260523, at *4 (Tex. App.—San Antonio 2009, pet. denied), we reviewed the rent and arbitration provision and concluded that the "replacement cost" of the "real estate is not ascertainable because 'replacement cost' cannot be assigned to real property since real property is individually unique and is not replaceable." Based on this language, we held the arbitration agreement was not enforceable. *Id.* The trial court has since ruled that the rent provision is enforceable but ambiguous and that its meaning should be determined by a jury. Thus, we agree with Dick that the meaning of the rent provision could not have been clear to a layman like him, even in the face of Stacy's alleged misrepresentations. Dick testified in his deposition that the rent clause was confusing, he needed help in complying with it, and he relied on Stacy to compute the rent.

Stacy additionally argues that if Dick had read the reorganization documents, he would have known that those documents did not mention the Camp Mystic trademark. As explained above, Dick was under no duty to read the reorganization documents. Moreover, a mere reading of the documents would not have revealed whether the trademark was conveyed. One of the reorganization documents, the Conveyance, states, "Transferor hereby transfers . . . unto Transferee . . . all of Transferor's right, title, and interest in and to all of Transferor's livestock, equipment, and *other personal property associated with the summer camp* for girls known as Camp Mystic in Hunt, Texas. . . ." (emphasis added). Relying on this language in the Conveyance that "personal property associated with the camp" was conveyed to New CM, Dick argues that the Conveyance did convey the trademark to New CM because a trademark is

"personal property." Indeed, the jury in February 2011 found that New CM did acquire ownership of the Camp Mystic trademark in the 1998 reorganization.

New CM and Dick's claims regarding the trademark arise not from whether the trademark was actually conveyed in the 1998 reorganization, but from Stacy's failure to draft reorganization documents that unambiguously conveyed the trademark to New CM and from Stacy's failure to disclose that he did not intend for New CM to own the Camp Mystic trademark (or any other valuable assets). Dick affirms that he first learned that Stacy was claiming that NFP, not New CM, owned the Camp Mystic trademark in April 2007. New CM and Dick emphasize that for nine years, New CM continued to use the Camp Mystic trademark, and neither Stacy nor any other member of the NFP Board ever stated that New CM did not own the corporate name or the trademark. Stacy testified that he did not discuss the trademark issue with Dick. The word "trademark" does not appear in NFP's corporate minutes from 1998 to 2007, nor is there a reference to an implied license for New CM to use the trademark (which is what Stacy contends New CM had).

Finally, Stacy argues that there is evidence that Dick read the reorganization documents in 1998 and thus the discovery rule should not apply. The record, however, does not show as a matter of law that Dick read the disputed provisions of the reorganization documents in 1998 and that he understood the document's alleged deficiencies in 1998. For the reasons stated above, we conclude that Stacy has not conclusively established that the discovery rule should not apply.

*C.      Knowledge of Attorneys Consulted by Dick*

Stacy argues that Dick consulted with lawyers Schnall, Jackson, and Peschel, who gained knowledge during their representation that was sufficient to start the limitations period and that should be imputed to Dick. New CM and Dick respond that the record does not establish as a

matter of law that these lawyers gained any knowledge within the scope of their representation sufficient to start the limitations period. We agree with New CM and Dick that Stacy has not met his burden of proving, as a matter of law, the limitations period should start because of knowledge that should be imputed to Dick.

In his brief, Stacy relies on *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 159-60 (Tex. 2004), for the proposition that knowledge gained by an attorney is imputed to a client. In that case, the supreme court discussed when an attorney has a duty to disclose information to a client. *See id.* The supreme court explained that "[g]enerally, a lawyer's fiduciary duties to a client, although extremely important, extend only to dealings within the scope of the underlying relationship of the parties." *Id.* at 159 (quotations omitted). "While it is true that an attorney owes a client a duty to inform the client of matters material to the representation, this duty to inform does not extend to matters beyond the scope of the representation." *Id.* at 160; *see also Trousdale v. Henry*, 261 S.W.3d 221, 229 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (explaining that "[a]s a fiduciary, an attorney is obligated to render a full and fair disclosure of facts material to the client's representation," but that "this duty to inform does not extend to matters beyond the scope of representation"). "In fact, the lawyer may not act beyond the scope of the contemplated representation without additional authorization from the client." *Two Thirty Nine Joint Venture*, 145 S.W.3d at 160. Thus, in order to meet his summary judgment burden, Stacy must show as a matter of law that any knowledge relating to limitations, which was acquired by the attorneys hired by Dick, was material to the representation and was not beyond the scope of the representation.

Stacy argues that (1) attorneys Marc Schnall and David Jackson were retained by Dick "to represent him independently regarding different aspects of the reorganization and lease" and

(2) Schnall and Jackson "reviewed and analyzed the lease and reorganization transaction that are the subject of the legal malpractice claims and advised Dick regarding those transactions." According to Stacy, if New CM and Dick "were not aware of their claims from the plain language of the documents themselves in 1998 (and they were), after they hired independent counsel, they knew of their legal malpractice claims by early 2003 as a matter of law." Stacy then points to evidence in the record supporting his assertion that Schnall and Jackson analyzed the documents at issue in this case. New CM and Dick, however, also point to evidence in the record that neither Schnall nor Jackson were hired to analyze and give advice with respect to the documents at issue. We emphasize once again that Stacy had the burden to prove, as a matter of law, when the limitations period began.

Marc Schnall was retained in 2003 to memorialize the resolutions and unanimous consents that occurred from 1998 to 2003 by the New CM Board of Directors. Dick affirmed in his second supplemental affidavit that neither he nor New CM engaged Schnall "to review, evaluate, or otherwise give legal advice concerning any interpretation of the legal effect or meaning or application of the 1998 Lease, the conveyance of the Camp Mystic trademark, or any conflicts of interest or breach of fiduciary duty by S. Stacy Eastland." Schnall was retained to document certain prior actions of New CM and to update corporate documents accordingly. Schnall affirms in his affidavit that he

> was requested by Richard G. Eastland to document certain prior action taken by Camp Mystic, Inc., and to thereby bring the corporate documents up to date. I did so, but was not engaged to perform, nor did I perform any study, interpretation, or evaluation of the legal effect or wisdom of the prior transactions [that] were documented in the corporate resolutions. In particular, while I had access to a copy of the Ground and Building Lease Between Natural Fountains Properties, Inc. and Camp Mystic, Inc. (the "Lease"), I looked at the Lease to obtain the number of acres applicable, not to perform a legal evaluation of the terms of the Lease. I do not recall performing any such legal analysis of the documents the

subject of the Camp Mystic, Inc. corporate resolutions, including the Lease, and such evaluation was not within the scope of my engagement.

Thus, there is evidence in the record that not only was Schnall not hired to evaluate the Lease, but that he did not acquire any knowledge of the Lease's possible deficiencies.

Similarly, David Jackson testified during his deposition that (1) it was not within the scope of his engagement with Dick for him to analyze the trademark in regard to Camp Mystic, Inc.; (2) it was not within the scope of his engagement to advise Dick in regard to the lease term of the 1998 Lease; (3) it was not within the scope of his engagement to advise Dick on the calculation of rent under the 1998 Lease; and (4) it was not within the scope of his engagement to analyze the validity of the 1998 Lease in whole or in part. Additionally, in his second supplemental affidavit, Dick affirms that David Jackson was not hired to review, evaluate, or otherwise give legal advice concerning any interpretation of the legal effect or meaning or application of the Lease, the Conveyance, or any conflicts of interest or breach of fiduciary duty by Stacy. Thus, there is evidence in the record that it was not within the scope of Jackson's representation to analyze, evaluate, or give any legal advice regarding the matters at issue here.

Finally, we note that there is also evidence in the record that Peschel was not hired to evaluate and give advice about the matters at issue in this case. In his second supplemental affidavit, Dick affirms that he did not hire Peschel to review, evaluate, or otherwise give legal advice concerning any interpretation of the legal effect or meaning or application of the Lease, the Conveyance, or any conflicts of interest or breach of fiduciary duty by Stacy. Peschel affirms in his affidavit that in May 2005, he was engaged by NFP "in a matter involving potential litigation." According to Peschel, the "scope of that engagement did not include the review or analysis of the lease terms between NFP and Camp Mystic, Inc." Further, Peschel affirms that he did not review the actual 1998 Lease in July 2005, nor did have a copy of the Lease in his

possession. According to Peschel, it was not until April 18, 2006, that he reviewed the Lease. "Prior to that time [he] had not evaluated the legal effect or the validity of the Lease as a whole, nor had [he] analyzed the term of the Lease or the rent provisions of the Lease, nor was such review, evaluation, or analysis within the scope of [his] engagement on this matter." Thus, there is evidence in the record that it was not within the scope of Peschel's representation to analyze, evaluate, or give any legal advice regarding the matters at issue here.

We, therefore, conclude that Stacy has not proven as a matter of law that any knowledge acquired by Schnall, Jackson, or Peschel was within the scope of their respective representations of Dick. And, for the reasons stated above, the trial court should not have granted Stacy's traditional motion for summary judgment.

### NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

In the trial court, Stacy moved for a no-evidence summary judgment on the grounds that there was no evidence of the breach, causation, or damages elements of New CM and Dick's claims for negligent misrepresentation, legal malpractice, and breach of fiduciary duty. On appeal, New CM and Dick argue that the trial court erred in granting the no-evidence motion for summary judgment because there is evidence in the record that raises a fact issue with respect to breach, causation, and damages. We agree.

Under Rule 166a(i), a party may move for a no-evidence summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). The trial court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact. *Id.* The respondent is "not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements." TEX.

R. CIV. P. 166a(i) cmt-1997. In reviewing a trial court's order granting a no-evidence summary judgment, we consider the evidence in the light most favorable to the respondent and disregard all contrary evidence and inferences. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003). Thus, a no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *Id.* at 751; *see* TEX. R. CIV. P. 166a(i). In determining if the respondent has brought forth more than a scintilla of evidence, we consider whether the evidence would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

New CM and Dick sued Stacy for negligent misrepresentation, legal malpractice, and breach of fiduciary duty. To state a claim for negligent misrepresentation, a plaintiff must show that (1) a defendant made a representation to a plaintiff in the course of the defendant's business or in a transaction in which the defendant had an interest; (2) the defendant supplied false information for the guidance of others; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; (4) the plaintiff justifiably relied on the representation; and (5) the defendant's negligent misrepresentation proximately caused the plaintiff's injury. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999). To state a claim for legal malpractice, a plaintiff must show that (1) the attorney owed the plaintiff a duty; (2) the attorney's negligent act or omission breached that duty; (3) the breach proximately caused the plaintiff's injury; and (4) the plaintiff suffered damages. *Akin, Gump, Strauss, Hauer & Feld, LLP v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 112 (Tex. 2009). To state a claim for breach of fiduciary duty, a plaintiff must show that (1) the plaintiff and defendant had a fiduciary relationship; (2) the defendant breached its fiduciary

duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant. *Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999). Stacy's no-evidence motion for summary judgment argued there was no evidence of the breach, causation, or damages elements for each of these three claims.

### A. Breach

#### 1. Negligent Misrepresentation

In his no-evidence motion for summary judgment, Stacy argued that there was no evidence of negligent misrepresentations. New CM and Dick responded with evidence showing that Stacy made misrepresentations with regard to the Lease's rent provision and the Lease's term. With regard to the rent provision, there is evidence that Stacy represented to Dick that the rent should be calculated based on dividends paid in 1997 to the shareholders of the old Camp Mystic, Inc. There is evidence that this representation was false and that Stacy made it in the course of Stacy's business as a lawyer representing New CM and Dick. There is also evidence that Stacy made this representation in a transaction in which he had a pecuniary interest. With regard to the Lease's term, there is evidence that Stacy represented to Dick that the Lease had a "five-year rollover term" and that such a representation was false. There is evidence that this representation was made in the course of Stacy's business and in a transaction in which he had a pecuniary interest. There is also evidence in the record that Stacy did not exercise reasonable care in communicating information regarding the rent provision and the term of the Lease and that Dick justifiably relied on Stacy's misrepresentations. Thus, we conclude there is evidence of negligent misrepresentations.

2.      Legal Malpractice and Breach of Fiduciary Duty

a.      Rent Provision

Stacy argues that there is no evidence that the rent provision was negligently drafted. However, in *Eastland*, 2009 WL 260523, at \*4, we held that the clause made the arbitration agreement unenforceable because "the 'replacement cost' of the real estate is not ascertainable because 'replacement cost' cannot be assigned to real property since real property is individually unique and is not replaceable." New CM and Dick emphasize that a "reasonably prudent attorney drafting a lease should be aware of controlling law that every piece of real estate is unique and, therefore, can have no "replacement" cost. According to New CM and Dick, "the fact that Stacy drafted the original rent clause to base the rent on a value that was 'not ascertainable' is more than sufficient." New CM and Dick point to the Affidavit of James M. McCormack, an expert witness, who affirmed,

> Stacy Eastland also failed to meet the standard of care for Texas attorneys in his preparation and/or oversight of the preparation of the Lease in that the Lease contained unenforceable provisions, including the rent formula provision. The rent formula provision is unenforceable because it is based, in part, on the "replacement cost" of real property. A reasonably prudent Texas attorney would know that land has no "replacement cost" and would not have included that concept in a real estate lease. My opinion in this regard is consistent with the Court's Order Granting Motion for Partial Summary Judgment in this cause dated August 14, 2008. The result of Stacy Eastland's failure to meet the standard of care in this regard is an unenforceable Lease and the attendant legal expenses and time expended by plaintiffs to establish this fact in this suit.

Thus, we conclude New CM and Dick raised a material issue of fact with regard to negligence in drafting the rent provision.

b.      Lease Term

New CM and Dick argue that there is evidence in the record that raises a fact issue with regard to whether Stacy breached his duty by giving negligent advice about the term of the

Lease. We agree. There is evidence in the record that (1) Stacy represented to Dick that the Lease had a "five-year rollover term"; and (2) Stacy told Dick a "five-year rollover term" meant that if NFP terminated the Lease, New CM and Dick would have an additional five years to vacate. There is also evidence that the Lease did not, in fact, have the five-year rollover term as Dick understood that term to mean.

c.       Conflict of Interests

Stacy claims that there is no evidence of any conflict of interest among the parties to the 1998 reorganization because the family members were *generally* all on the same page with respect to the reorganization. Stacy's brief recognizes that there were some conflicts among the family members but nonetheless argues that "both the Texas Disciplinary Rules of Professional Conduct and case law recognize that a lawyer may permissibly represent both sides to a transaction if their interests were *generally* aligned." (emphasis added). Whether the parties' interests are "generally aligned" is a fact issue for a jury. In responding to Stacy's no-evidence motion for summary judgment, all New CM and Dick needed to show was there was a conflict of interest and that Stacy did not disclose the conflict of interest.

In support of his argument there was no evidence of any conflict, Stacy points to the following testimony of Dick during his deposition:

> Q: But you can't tell me what it is that you wanted that Nancy or Stacy or your mom didn't want in this reorganization? You can't tell me a specific thing that, you know, I didn't want to pay rent. They wanted me to pay rent, or I wanted the trademark and they didn't want me to have the trademark. You can't identify a specific issue where you were saying I want A and they were saying you can't have A. Isn't that right?
>
> A: I can't think of anything right now.

Dick also testified, however, as follows:

Q: Now, you mentioned before that Stacy was on both sides of the transaction, and we may have already talked about this, but what is it that Stacy's side of the transaction, or the NFP side, wanted that was different from Camp Mystic?

A: Well, it's – I believe today that there were – you've got a landlord and you've got a tenant, and the landlord obviously is going to want things different than the tenant. The landlord probably wants higher rent; the tenant probably wants less – lesser rent. And so I think there was a conflict there, especially the fact that Stacy had an interest in the landlord position.

Further, according to New CM and Dick, Stacy's argument misstates their conflict-of-interest claim and ignores the attorney's responsibility to disclose a conflict of interest. New CM and Dick emphasize that the conflict of interest is not that Dick wanted something different from the rest of the family. They argue that the conflicts were that

1. Stacy represented all sides in negotiating and preparing the Lease and Conveyance without disclosing or obtaining a waiver of conflicts;

2. Stacy represented all sides to both transactions, even though he would benefit financially from any benefits given to NFP at the expense of New CM;

3. Stacy put Dick in a conflict position by the way he crafted the reorganization – having Dick own 100% of New CM when Dick owned 38% of NFP and served on its board – when Stacy knew Dick would inherit stock from their mother that would result in a 52% ownership in NFP.

Indeed, the record shows a fact issue regarding whether there were conflicts of interest that Stacy should have disclosed to Dick. Stacy testified that everyone was on the same page in the reorganization about limiting liability of the old corporation. However, Stacy also admitted in his deposition that such a goal was not the only goal. One goal was to give Dick ownership of the camp's operations, so that he would not be required to approach the Board each year and ask for a raise. Another goal was to reward operational owners of the camp in comparison to capital owners of the camp. Thus, the parties to the reorganization wanted the camp to grow and extend beyond this generation. From reading Stacy's deposition, it is clear that Stacy was focused on limiting liability of the old corporation and limiting taxation. Thus, he testified that in drafting

the reorganization documents, it was his intent that New CM not receive anything of real value. First, Stacy did not want anything of real value to go to New CM because he did not want creditors to be able to obtain anything of value. Second, if the documents transferred anything of real value to New CM without consideration, then Stacy was concerned NFP could be found not to be an appropriate S corporation. Thus, Stacy testified that he intentionally drafted the Lease to be short term (so as to not be valuable), and did not intend to transfer the Camp Mystic trademark to New CM.

Dick, however, testified in his deposition that he did not know any of this. Dick thought he was getting a valuable lease and trademark in the reorganization. Otherwise, Dick testified he would not have put himself at risk of being held personally liable.[3] He thought if the lease terminated, he would have five years to find suitable property. And, he thought the trademark had been transferred to New CM. Therefore, there is evidence in the record that raises a fact issue with regard to whether Stacy breached his duty to his clients by representing all sides to the reorganization transaction and failing to disclose conflicts of interest. There is evidence that Stacy represented all sides to the transaction regarding the Lease, that he had a duty to disclose those conflicts of interest, and that he failed to do so.

### d. Camp Mystic Trademark

Stacy argues that New CM and Dick have no evidence of (1) any misrepresentation by Stacy with respect to the conveyance of the trademark; (2) any fact Stacy concealed; and (3) any representation by Stacy that the assignment clause in the Conveyance included the trademark. New CM and Dick counter that their claim relating to the trademark is based on a *failure to disclose* – not on an affirmative misrepresentation. They emphasize that Stacy himself admits

---

[3] Dick testified that he has since been advised that not only would his stock in New CM be subject to liability, but his stock in NFP would also be at risk.

that he believed the trademark had not been conveyed and that he did not disclose that belief to Dick. New CM and Dick then point to case law providing that an attorney's failure to disclose relevant information can constitute negligence. *See Kimleco Petroleum, Inc. v. Morrison & Shelton, P.C.*, 91 S.W.3d 921, 923-24 (Tex. App.—Fort Worth 2002, pet. denied). Thus, they argue Stacy's admission that he did not disclose his true beliefs about the ownership of the trademark is evidence that Stacy breached the standard of care. We agree the evidence in the record raises a fact issue. There is evidence that Stacy told Dick that New CM was going to get the name "Camp Mystic." There is evidence that Dick's belief that the trademark had been transferred to New CM was consistent with Stacy's conduct for nine years. There is also evidence that Stacy did not advise New CM and Dick that he did not intend the trademark to be transferred to New CM in the reorganization. Further the Conveyance, which was prepared by Stacy, was determined by the trial court to be ambiguous on the issue of whether the trademark was transferred to New CM, requiring a jury trial to determine the true intent of the parties in the conveyance.

For the above reasons, we therefore conclude that there is evidence in the record to support the breach element with respect to New CM and Dick's claims for negligent misrepresentation, legal malpractice, and breach of fiduciary duty.

### B. Causation and Damages

Stacy argues that there is no evidence of damages because the only damages New CM and Dick attribute to problems with the Lease and Conveyance are their attorneys' fees in this litigation. Stacy emphasizes that Texas follows the American Rule, under which absent a contract or statute, a party cannot recover attorney's fees incurred in prosecuting or defending a lawsuit. *See Akin Gump*, 299 S.W.3d at 120. New CM and Dick counter that they do not seek to

recover litigation costs as the prevailing party. Instead, they argue that "they seek their litigation costs as damages that resulted from Stacy's legal malpractice." New CM and Dick agree that they cannot recover the costs of prosecuting their malpractice action because those costs are barred by the American Rule. However, they argue they can recover the costs of the litigation over the Lease and Conveyance that were caused by Stacy's malpractice regarding the Lease and Conveyance.

The Texas Supreme Court has made this distinction. In *Akin, Gump*, 299 S.W.3d at 119, the Texas Supreme Court held that "the general rule as to recovery of attorney's fees from an adverse party in litigation does not bar a malpractice plaintiff from claiming damages in the malpractice case for fees it paid its attorneys in the underlying suit." The court distinguished the American Rule, noting that the former client did not seek to recover attorney's fees for prosecuting its malpractice claim against its former lawyer. *Id.* at 121. "It seeks damages measured by the economic harm it suffered from Akin Gump's breach of its duty of care in prosecuting the Panda suit." *Id.* Thus, the court adopted a rule that "a malpractice plaintiff may recover damages for attorney's fees paid in the underlying case to the extent the fees were proximately caused by the defendant attorney's negligence." *Id.* at 122. That is, a former client can recover litigation costs from his attorney when the attorney's malpractice requires a party to protect his own interests by prosecuting or defending an action. *See id.* at 120-22.

Stacy additionally argues that even if the American Rule does not bar attorneys' fees in this case, there is no evidence that Stacy's negligence or breach of fiduciary duty proximately caused the attorneys' fees. Proximate cause has two elements: cause in fact and foreseeability. *Id.* at 122. Cause in fact must be established by proof that (1) the negligent act or omission was a

substantial factor in bringing about the harm at issue; and (2) absent the negligent act or omission, the harm would not have occurred. *Id.*

Stacy first argues there is no evidence to link any of their attorneys' fees to any problems with the rent provision. New CM and Dick counter that

> [t]hey do not seek damages for overpaid rent or a stolen trademark. So they do not have to provide evidence of proximate cause for such harm. The harm they allege is being forced to engage in costly litigation because of Stacy's errors, omissions, and lack of prudence in drafting the Lease and advising his clients. The harm from a shortened lease is established by expert testimony[4] that the difference in value to New CM between a five-year lease and a one-year lease was over $1 million.

New CM and Dick also point to Dick's affidavit, which affirms Stacy's negligent drafting and advice regarding the rent clause has caused litigation in two different lawsuits. We conclude there is evidence in the record to raise a fact issue.

Stacy argues that there is no evidence of damages relating to the lease term because the Lease was in effect for over ten years. Stacy emphasizes that the lease "lasted at least ten years – double the five years Appellants say it was supposed to last." However, we note that according to Dick's deposition testimony, Stacy represented to him that a five-year rollover lease meant that if NFP terminated the Lease, New CM and Dick would have an additional five years to vacate. Thus, Stacy is incorrect in his assertion that the Lease lasted "double the five years Appellants say it was supposed to last." If there had been a five-year rollover term as Dick understood, the Lease would have renewed an additional five years each year it was not terminated, thus extending the Lease for over ten years. New CM and Dick argue that they were damaged because the Lease did not have a five-year rollover term as represented. As evidence of damages, they point to David Fuller's expert report and the litigation costs as discussed above. We conclude the evidence in the record raises a fact issue.

---

[4] The expert report of David N. Fuller, CFA, ASA, makes this valuation.

Stacy once again argues that even if there was a conflict among the parties to the reorganization, there is no evidence that Stacy's failure to disclose a conflict proximately caused damages. New CM and Dick respond that as discussed previously,

> there was evidence that damages were caused by each of Stacy's acts of negligence regarding the Lease term, the rent amount, and the trademark. And with every one of these acts of negligence, Stacy had a conflict of interest because he represented New CM and Dick in matters where Stacy had an interest in the other side of the transaction. A reasonable juror could conclude that damages that flowed from Stacy's acts of negligence also flowed from his conflicts of interest.

We agree that the evidence in the record raises a fact issue.

Finally, Stacy argues that there is no evidence of any damages with regard to the trademark. New CM and Dick once again point to the litigation costs they incurred because Stacy failed to advise them about his opinion that the trademark had not been conveyed and because the Conveyance drafted by Stacy was ambiguous and had to be presented to the jury to resolve. We agree the evidence in the record raises a fact issue.

We therefore conclude that the trial court should not have granted Stacy's no-evidence motion for summary judgment.

## CONCLUSION

Because Stacy failed to meet his burden in proving that limitations barred New CM and Dick's claims as a matter of law and because New CM and Dick raised issues of material fact sufficient to defeat Stacy's no-evidence motion for summary judgment, we reverse the judgment of the trial court and remand the cause for further proceedings consistent with this opinion.


Karen Angelini, Justice